**N.B., et al., Appellants–Plaintiffs,**

v.

**Peter A. SYBINSKI, et al., Appellees–Defendants.**

**No. 49A02–9904–CV–311.**

Court of Appeals of Indiana.

Feb. 28, 2000.

---

Jacquelyn E. Bowie, Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, Indiana, Attorneys for Appellants.

Jeffrey A. Modisett, Attorney General of Indiana, Jon Laramore, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellees.

**OPINION**

GARRARD, Senior Judge

**Case Summary**

N.B., et al. ("Class") appeal the trial court's order of summary judgment in favor of the Indiana Family and Social Services Administration, et al. ("State") holding that the family cap policy of the Temporary Assistance to Needy Families Program ("TANF") is constitutional. We affirm.

**Statement of Issues**

The Class presents three issues for our review, which we consolidate and restate as follows:

I. Whether the family cap provision violates the Equal Protection Clause of the United States Constitution; and

II. Whether the family cap provision violates substantive due process.

**Facts and Procedural History**

Before June 1994, Indiana participated in the federal·Aid to Families with Dependent Children ("AFDC") program, which provided cash benefits to low-income families with needy children. *See* IND. CODE § 12–13–7–1(10); 42 U.S.C. § 601 *et seq.*, *repealed by* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104–193, § 103(a), 110 Stat. 2112. AFDC was a joint federal-state program funded primarily by the federal government but implemented by the states. State programs were required to meet certain federal guidelines, but each state retained freedom in operating its program.

In June 1994, Indiana requested waivers of certain AFDC requirements so that Indiana could implement an experimental reform project pursuant to section 1115 of the Social Security Act. 42 U.S.C. § 1315(a) (1994). On December 15, 1994, the Secretary of Health and Human Services (HHS) approved thirty-three of Indiana's forty-two waiver requests, and the State, through the FSSA, implemented the waivers on May 1, 1995. These waivers included the family cap, time limitations on welfare benefits, work requirements, school attendance requirements, and child immunization guidelines. These waivers were codified by the General Assembly in 1995.

In December 1995, Indiana sought thirty-two additional waivers in an attempt to expand its welfare reform efforts. HHS approved the additional waivers in August 1996, and Indiana implemented the waivers on June 1, 1997. These waivers included further work requirements, a 24–month lifetime limit on receiving AFDC, a requirement that minor heads of AFDC households live with a responsible adult, and a child care voucher program.

In August 1996, the federal government passed the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), which eliminated the federal AFDC program and replaced it with a block grant to states that provided Temporary Assistance to Needy Families (TANF). 42 U.S.C. § 601 *et seq.* (1996). The block grants provide greater flexibility to states in designing and operating their own welfare programs. The PRWORA permitted states with waivers to continue to implement the welfare programs they had commenced under prior law until the waivers expire. 42 U.S.C. § 615 (1996). Indiana continues to operate under the 1994 and 1996 waivers and will do so until April 2002. States operating under waivers continue to receive federal funds for implementation and evaluation of their welfare reforms. 42 U.S.C. §§ 615, 1315 (1996).

Pursuant to its waivers, Indiana implemented a welfare reform program with the stated intention "to keep families together, to emphasize the dignity of work and to achieve self-sufficiency through personal responsibility." Supp. Record at 4. In his request for the waivers, Governor Bayh stated that Indiana's welfare reform proposal had four basic premises:

> Work must be more attractive than welfare; each recipient must be responsible for, and participate in, the process of self-sufficiency; ... the welfare system must ensure equity with the unsubsidized working poor; [and] public assistance must be a temporary situation rather than a permanent way of life. Supp. Record at 3.

Although Indiana has implemented several reforms under the waivers, the Class limits its challenge to the family cap provision. Under Indiana's former AFDC program, when an AFDC recipient gave birth to a child, the family's AFDC benefits were increased by approximately $59 a month to provide for the needs of the newborn. The family cap provision, however, eliminates the automatic increase provided under AFDC. Under the family cap rule, TANF assistance is not provided to a child who is born to a TANF recipient ten or more months following the month in which the family began receiving benefits. There are four exceptions in which the welfare grant will be increased upon the birth of an additional child: 1) when the child was conceived through incest or sexual assault; 2) when the child is born to a minor included in an AFDC grant who becomes a first-time minor parent; 3) when the child does not reside with his or her parent; and 4) when the child was conceived in a month that the family was not on TANF. Supp. Record at 122, 182. Although they do not receive an increase in cash benefits, children subject to the family cap remain eligible for other benefits including vouchers for food products through the Women–Infants–Children's program, food stamps, and Medicaid payments.

Indiana's stated purposes for the family cap emphasized that: 1) giving birth is an issue of personal responsibility; 2) giving birth to an additional child may create further barriers to financial independence and self-sufficiency; 3) families should consider the financial and personal responsibility involved in having a child; and 4) eliminating the automatic increase in benefits places welfare recipients on par with working families. Supp. Record at 47; Record at 53. For evaluation purposes, Indiana hypothesized that the family cap would lead to a reduced childbirth rate.

Specifically, the State theorized that reduced fertility would lead to fewer children born into a dependent situation; an increase in work; and more parent time per child. Supp. Record at 553–54.

Under the federal waivers, Indiana is required to conduct its welfare reform program as an experimental project in order to evaluate the effects of the changes. 42 U.S.C. § 1315(a). The approval from HHS set forth requirements for the project. Under Indiana's plan, all AFDC recipients were placed randomly into either an experimental group or a control group. Those in the experimental group received benefits and services under Indiana's welfare reform program as permitted by the federal waivers. Those in the control group continued to receive benefits under the AFDC rules in effect prior to grant of the waivers. Approximately 95 percent of recipients were in the experimental group, and 5 percent in the control group.

Indiana contracted with Abt Associates, Inc. ("Abt") to evaluate the changes implemented under the waivers. The evaluation is designed to measure differences between the experimental group (welfare reform/TANF) and the control group (AFDC). The two groups are evaluated regarding the goals of welfare reform such as personal responsibility, self-sufficiency, and equity with the working poor. Abt is not separately evaluating any specific effects that might arise solely from the family cap. Abt will evaluate the costs and benefits of welfare reform to welfare recipients, taxpayers, and the state. Through surveys and statistical databases, Abt will compile data about births in both groups, as well as data on children born in the experimental group who do not live with their parents. In addition, the evaluation will measure the effects of welfare reform on family structure and child well-being.

N.B. and her minor child, L.K., filed their complaint on May 22, 1997. N.B. has two children in addition to L.K. and had been receiving AFDC benefits approximately three years prior to filing the complaint. L.K. was born to N.B. on February 22, 1997. L.K. was conceived despite N.B.'s use of birth control at the time of L.K.'s conception. N.B.'s TANF caseworker informed her that her cash benefits would not increase after the birth of L.K. because L.K. was born ten months or more after N.B. began receiving AFDC/TANF benefits. On October 23, 1997, by agreement of the parties, the trial court certified a plaintiff class consisting of TANF recipients and their children who, because of the federal waivers, are not eligible for additional cash benefits upon the birth of a child. The Class moved for summary judgment on October 21, 1998. The State responded and moved for summary judgment on December 18, 1998. On April 19, 1999, the trial court entered summary judgment in favor of the State. This appeal now ensues.

### Discussion and Decision

#### Standard of Review

Our summary judgment standard of review is well settled. Upon review of the grant or denial of a motion for summary judgment, we apply the same legal standard as the trial court. *Erie Insurance Co. v. American Painting Co.*, 678 N.E.2d 844, 845 (Ind.Ct.App.1997). Summary judgment shall be granted if the designated evidence shows that there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Sizemore v. Arnold*, 647 N.E.2d 697, 698–99 (Ind.Ct. App.1995). Once the moving party has sustained its initial burden of showing the absence of a genuine issue and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts showing a genuine issue for trial. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind.1992). We will resolve any doubt as to fact or inference to be drawn from the evidence in favor of the party opposing the motion. *Frye v. Trustees of Rumbletown Free Methodist Church*, 657 N.E.2d 745, 747 (Ind.Ct.App.1995). The fact that the parties make cross-motions

for summary judgment does not alter our standard of review. *Hendricks County Bank & Trust Co. v. Guthrie Building Materials, Inc.*, 663 N.E.2d 1180, 1183 (Ind.Ct.App.1996), *trans. denied.*

Where, as here, the material facts are essentially undisputed, our sole task is to determine whether the trial court properly applied the law to the facts. *Laux v. Chopin Land Associates, Inc.*, 615 N.E.2d 902, 905 (Ind.Ct.App.1993), *trans. denied.* Although the trial court entered findings of fact and conclusions of law, they are not binding upon this court. *Eck & Associates, Inc. v. Alusuisse Flexible Packaging, Inc.*, 700 N.E.2d 1163, 1166 (Ind.Ct.App. 1998), *trans. denied.* However, the findings facilitate our review by providing valuable insight into the court's decision. *Id.*

The Class challenges the family cap provision under the Equal Protection Clause of the U.S. Constitution and the Due Process Clause of the U.S. and Indiana Constitutions. *See* U.S. CONST. amend. XIV, § 1; IND. CONST. art. 1, § 12. The State argues that the family cap is constitutional because there is a rational basis for the provision and it is related to a legitimate government interest.

## I. Equal Protection Clause

■ The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "The usual standard of review for a statute or regulation challenged on equal protection grounds is the rational basis test. Under this test, legislation is presumed to be valid, and will be sustained as long as the classification drawn by the statute is rationally related to a legitimate state interest." *Indiana High School Athletic Ass'n, Inc. v. Schafer,* 598 N.E.2d 540, 551 (Ind.Ct.App.1992), *trans. denied.* When a statute classifies by a suspect class or impinges on fundamental rights, however, the statute is subject to strict scrutiny. Such statutes "will be sustained only if they are suitably tailored to serve a com-

pelling state interest." *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). In the present case, the Class challenges two classifications created by the family cap rule: (1) capped children living with their parents versus capped children living with other caretakers and (2) the treatment group versus the control group. The Class contends that the family cap is unconstitutional because it fails under both a strict scrutiny and rational basis standard of review. We will discuss each of the Class's claims in turn.

### ·A. Classification Within the Treatment Group

■ The Class contends that the family cap provision is unconstitutional because it discriminates among children in the treatment group. The family cap rule provides that children born ten months after a family starts receiving TANF benefits will not receive additional benefits. IND. ADMIN. CODE tit. 470, r. 14–2–2 (1996). However, if the child lives with a qualified caretaker other than a parent, the child may receive benefits. *Id.* r. 14–2–2(b)(3). The Class argues that capping cash benefits to TANF families, but allowing benefits to the child if he lives with another caretaker forces parents to break up the family unit to ensure that the child's most basic physical needs are met. The Class asserts that the distinction between capped children living with their parents and those living with other caretakers lacks a rational basis and infringes on the right of family association. Therefore, the Class contends the family cap is subject to strict scrutiny because it infringes on a fundamental right.

While the family cap may have some incidental effect on family structure, we disagree that such effect requires a heightened level of review. We find the U.S. Supreme Court's analysis in *Bowen v. Gilliard,* 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987) instructive. In *Bowen,* appellants challenged an amendment re-

quiring that child support be included in the income of AFDC families. By including children receiving child support payments in the family unit, the families received less income than they would have if the supported child could have been excluded from the AFDC filing unit. Appellants argued that the amendment forced them to separate their families in order to avoid this effect and thus substantially interfered with the fundamental right of family association. The Court held that the government had a legitimate interest in distributing benefits fairly and the amendment was rationally related to that goal. The Court concluded that while the amendment may have an effect on family association, such a result was an unintended consequence and not a direct effect of the AFDC program. The Court went on to state: "That some families may choose to modify their living arrangements in order to avoid the effect of the amendment, does not transform the amendment into an act whose design and direct effect are to intrude on choices concerning family living arrangements." *See Bowen*, 483 U.S. at 601–02, 107 S.Ct. at 3017.

The case at bar is parallel to *Bowen.* Here, the Class argues that the family cap provision compels parents to send a capped child to another home in order for the child to receive benefits, thereby interfering with the fundamental right of family association. However, the family cap rule does not require that capped children be removed from the home. It merely provides economic support for individuals who take on the responsibility of caring for someone else's child. Parents of a capped child may keep the child in their home; however, they do not receive additional cash benefits.

Still, the Class argues that the family cap penalizes parents for exercising their fundamental right of family association.[1] We disagree. Indiana has done nothing to bar a TANF recipient from keeping a capped child in the home; rather, the

State has merely chosen not to subsidize the parents' fundamental right by removing the automatic benefit increase associated with an additional child under the AFDC program. *See C.K. v. Shalala,* 883 F.Supp. 991, 1014–15 (D.N.J.1995) (noting that while a state may not hinder one's exercise of protected choices, it is not obligated to subsidize a fundamental right), *aff'd by C.K. v. New Jersey DHHS,* 92 F.3d 171 (3d Cir.1996); *Rust v. Sullivan,* 500 U.S. 173, 201, 111 S.Ct. 1759, 1776, 114 L.Ed.2d 233 (1991) ("The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected ...."). The fact that some families may choose to remove a capped child from their home in order to avoid the effects of the family cap does not give the rule coercive effect and make it unconstitutional. Having concluded that the family cap does not impinge on a fundamental right, we review the classification under the rational basis test.

█ The State asserts that the family cap is rationally related to its legitimate interest in altering the cycle of welfare dependency. The State argues that the cap encourages self-sufficiency and personal responsibility, maintains parity between welfare recipients and the working poor, and provides incentives for family planning. The State further argues that the disparate treatment of capped children who remain in the home and those who are removed from the home is rational because it provides an incentive to those who are not legally responsible for the children to care for them, while also encouraging parents to achieve the goals of welfare reform. The Class contends that the only goal behind the family cap is to discourage child bearing and that such a goal is not a legitimate interest of the state.

Our review under the rational basis test is guided by the Supreme Court's holding in *Jefferson v. Hackney,* in which the Court stated that:

---

1. We note that the Class has failed to present any evidence that parents of capped children have actually been forced to place their children outside of the home.

So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them.

406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731–32, 32 L.Ed.2d 285 (1972). The state interest has been well documented in the record before us: to give TANF recipients the same structure of incentives as working people, to promote individual responsibility, and to strengthen and stabilize the family unit. These interests are clearly legitimate. As the Supreme Court held in *Dandridge v. Williams,* a "solid foundation for regulation can be found in the State's legitimate interest in encouraging employment and avoiding discrimination between welfare families and the families of the working poor." 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). Furthermore, states have "a legitimate interest in encouraging those of its citizens who can work to do so, and thus contribute to the societal well-being in addition to their personal and family support." *New York State Dep't of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973).

In *C.K. v. New Jersey DHHS,* the Third Circuit considered a family cap provision similar to Indiana's provision. 92 F.3d 171, 195 (3d Cir.1996), *aff'g C.K. v. Shalala,* 883 F.Supp. 991 (D.N.J.1995). There, the Third Circuit adopted the district court's analysis in holding that New Jersey's welfare reforms, including the family cap, "[were] rationally related to the legitimate state interests of 'altering the cycle of welfare dependency that [New Jersey] has determined AFDC engenders in its recipients as well as promoting individual responsibility and family stability.'" We find the district court's analysis in *C.K. v. Shalala* instructive. 883 F.Supp. 991 (D.N.J.1995). The state interests identified by the district court were identical to the interests presented by Indiana in this

case. *C.K. v. Shalala,* 883 F.Supp. 991, 1013 (D.N.J.1995), *aff'd by* 92 F.3d 171 (3d Cir.1996) (noting state's interest in promoting individual responsibility, creating parity between welfare recipients and working people, and stabilizing the family unit). The district court held that the family cap "reflect[ed] the reasoned legislative determination that a ceiling on benefits provides an incentive for parents to leave the welfare rolls for the work force, as any 'advantage' of welfare in the form of the per child benefit increase is no longer available." *Id.* at 1014.

Likewise, here, we conclude that the family cap is rationally related to the State's interest of promoting self-sufficiency. As the Supreme Court stated in *Dandridge:* "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" 397 U.S. at 485, 90 S.Ct. at 1161.

Although the parties dispute whether the purpose of the family cap is to reduce the birth rates of welfare recipients, the differing opinions that arise as a result of the State's hypothesis that the family cap will reduce fertility does not preclude a grant of summary judgment. The State has a legitimate interest in encouraging welfare recipients to act responsibly in child bearing. The State does not deprive the Class of the right to have children; rather, it merely chooses not to subsidize the increased costs of an additional child. While the family cap provision may lower childbirth rates among TANF recipients, we find no basis for the Class's claim that such an effect is the only interest of the State. While we acknowledge that there may be other methods that the State might have chosen to reform the welfare system, we conclude that Indiana has

sought to realize its reform goals in a reasonable and rational fashion.

Indiana's policy of providing benefits to children who do not live with their parents is also rational. The policy encourages other individuals to care for children who may otherwise be abandoned. The State has a legitimate interest in finding appropriate placements for these children and ensuring that they are cared for. By providing benefits to qualified non-parent caretakers, the State provides an incentive, albeit minimal, to these caretakers. "'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.'" *Dandridge,* 397 U.S. at 485, 90 S.Ct. at 1161 (quoting *Metropolis Theater Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913)). Therefore, we conclude that the classification within the treatment group has a rational relationship to an appropriate state purpose.

### B. Classification Between Treatment and Control Groups

■ The Class also challenges the classification between treatment and control group members under the family cap rule. Under the waivers granted by the federal government, the State was required to evaluate the effects of welfare reform through an experimental project design. Record at 260–61; *see also* 42 U.S.C. § 1315 (1994). Thus, some welfare recipients are subject to the AFDC program while the others are subject to the TANF program. The Class contends that there is no rational basis for applying the family cap to the treatment group but not to the control group because the State is not measuring the specific effects of the family cap in isolation from the entire group of welfare reforms, and therefore the family cap is unconstitutional. The State argues that the experimental design is rational because it provides an effective method of measuring the effects of welfare reform and complies with federal requirements for plans implemented under federal waivers.

We review the classification under the rational basis test because it does not involve a suspect class or fundamental right. The State has a legitimate governmental interest in gathering information regarding the effects of welfare reforms. Randomly assigning recipients to a treatment or control group is a rational method of conducting the necessary statistical evaluations. As the Second Circuit held in *Aguayo v. Richardson:* "A purpose to determine whether and how improvements can be made in the welfare system is as 'legitimate' or 'appropriate' as anything can be. This purpose is 'suitably furthered' by controlled experiments, a method long used in medical science which has its application in the social sciences as well." 473 F.2d 1090, 1109 (2d Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974). In *Aguayo,* appellants challenged the implementation of welfare reform on a less than statewide basis. The court held that evaluation of welfare reforms was a legitimate government interest and the limited experimental design provided a rational method of achieving that interest.

Likewise, we conclude that the State's legitimate interest in evaluating the TANF program supports the classification between treatment and control group members. "[T]he Equal Protection clause should not be held to prevent a state from conducting an experiment designed for the good of all, including the participants, on less than a statewide basis." *Aguayo,* 473 F.2d at 1109. Furthermore, the federal government required the State to implement the TANF program as a demonstration project in order for the State to receive federal funding. The State's decision to implement its welfare reforms in compliance with federal guidelines in order to obtain approval for the program is rational.

We find that the Class's contention that the family cap must be measured separately from the program as a whole is unpersuasive. The record indicates that the

State is collecting data related to two effects of the family cap: the childbirth rate as well as child well-being under the welfare reforms. As noted earlier, "[i]f a classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge*, 397 U.S. at 485, 90 S.Ct. at 1161. Therefore, we conclude that the family cap does not violate the Equal Protection Clause.

### II. Substantive Due Process

■■■■ The Class contends that the family cap rule violates substantive due process under both the U.S. and Indiana[2] Constitutions. Initially, we note that state and federal substantive due process analysis is identical. *See Indiana High Sch. Athletic Ass'n, Inc. v. Carlberg*, 694 N.E.2d 222, 241 (Ind.1997) (same analysis is applicable to claims brought under Due Process Clause of United States Constitution and Due Course of Law Clause of Indiana Constitution); *Hudgins v. McAtee*, 596 N.E.2d 286, 289 (Ind.Ct.App.1992). Substantive due process ensures that state action is not arbitrary or capricious regardless of the procedures used. *Kellogg v. City of Gary*, 562 N.E.2d 685, 698 (Ind. 1990). In setting forth a claim for violation of substantive due process, a party must show either that the law infringes upon a fundamental right or liberties deeply rooted in our nation's history or that the law does not bear a substantial relation to permissible state objectives. *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997); *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Pro-Eco, Inc. v. Board of Comm'rs of Jay County, Ind.*, 57 F.3d 505, 514 (7th Cir. 1995), *cert. denied*, 516 U.S. 1028, 116 S.Ct. 672, 133 L.Ed.2d 522. The Class's substantive due process challenge is two-fold: 1) the family cap infringes upon the funda-

mental right of family association, and 2) the family cap does not bear a substantial relation to permissible state goals. We will address each claim in turn.

■■■■ As we concluded in Section I, the family cap does not infringe upon the fundamental right of family association. While TANF recipients do not receive an increase in cash benefits for additional children, they are not compelled to remove a capped child from their home. "Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Harris v. McRae*, 448 U.S. 297, 317–18, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980).

■■■■ The Class also contends that the family cap provision violates substantive due process because "it punishes children by increasing their poverty without any rational justification for that punishment that would relate to a legitimate government interest." Appellant's Br. at 39. The Class argues that depriving the capped child of benefits is not rationally related to the State's goal of reducing birth rates among welfare recipients, as the child has no control over the behavior of the parent. The State asserts that its goal is not to reduce birth rates, but to promote self-sufficiency, family stability, and personal responsibility.

■■■■ To succeed on its substantive due process claim, the Class must show that the family cap is arbitrary and capricious. "[G]overnmental action passes the rational basis test if a sound reason may be hypothesized. The government need not prove the reason to a court's satisfaction." *Northside Sanitary Landfill, Inc. v. City of Indianapolis*, 902 F.2d 521, 522 (7th

---

**2.** The Due Course of Law Provision provides in relevant part that "every person, for injury done to him in his person, property, or repu-

tation, shall have remedy by due course of law." IND. CONST. art. 1, § 12.

Cir.1990). As discussed *supra,* the State has a legitimate interest in reforming welfare. The Class failed to demonstrate that there is no rational justification for the rule. As the court concluded in *C.K. v. Shalala,* the family cap does not punish children for the behavior of their parents, nor does it completely deprive children of benefits they might otherwise receive. *C.K.,* 883 F.Supp. at 1013. Rather, the cap "merely imposes a ceiling on the benefits accorded an AFDC household while permitting any additional child to share in that 'capped' family income." *Id.* For the same reasons discussed in Section I, we find that the family cap has a rational basis. Consequently, the provision does not violate substantive due process under the U.S. and Indiana Constitutions.

Therefore, the trial court's order granting summary judgment to the State is hereby affirmed.

Affirmed.

FRIEDLANDER and DARDEN, JJ., concur.